## Record Corporation v. Logan Construction Co., Inc.

*Larry Coploff*, for plaintiff.
*Richard Saxton*, for defendant.

BROWN, *P.J.*, June 3, 1982 —

### FINDINGS OF FACT

(1) Defendant Logan Construction Company, Inc., is a Pennsylvania corporation engaged in the construction business.

(2) In September of 1977, Logan entered into a

contract with the Borough of Renovo for the construction of a dam at the Paddy's Run Reservoir to be completed by November 24, 1978.

(3) In connection with this project defendant needed to purchase sluice gates to be used in its completion.

(4) Plaintiff, Record Corporation, a Maine business corporation is engaged in the business of supplying brass products and related items and was a manufacturer of sluice gates.

(5) In August of 1977, Logan contacted Record with regard to its submitting a written proposal to supply Logan with sluice gates and other accessories for the Paddy Run Project.

(6) On August 23, 1977, Record sent Logan a written offer to provide the needed sluice gates with a proposed delivery date of 16 to 18 weeks following the approval of Record's drawings.

(7) On October 7, 1977, Logan accepted Record's offer to furnish the five sluice gates as well as certain accessories with the delivery to be as previously stated 16 to 18 weeks after approval of the drawings.

(8) The drawings were approved on January 30, 1978 and forwarded to Record on February 4, 1978; some minor changes were made in the drawings in July of 1978 involving a shear gate which was in addition to the five gates originally ordered.

(9) In producing the sluice gates, Record required extruded bronze which had been supplied to it by Anaconda Brass since 1968.

(10) In mid October of 1977, Record was advised that its supply of extruded bronze from Anaconda would be interrupted because of a labor strike. This disruption in supply of extruded bronze lasted for a period of approximately six months.

(11) In December of 1977, Record advised Logan

of the Anaconda strike but also advised that it would not affect production of the cast iron gates ordered by Logan and it did not advise Logan of any delay in delivery.

(12) By a form letter dated April 28, 1978, Record allegedly notified all sluice gate customers of possible delays in delivery; however, the court finds that it has not been proven that Logan received a copy of this letter.

(13) In April of 1978 Logan was advised by plaintiff that the Anaconda strike was over and that the gates would be delivered in June of 1978.

(14) Throughout the summer of 1978 there were numerous inquiries by Logan of Record as to why the gates had not been delivered but there was no delivery throughout this time period.

(15) On September 18, 1978, Record's Vice President Robert Hay advised Logan that plaintiff was experiencing financial difficulties and could not get the iron castings from its supplier Seaboard Foundry, Inc. without first paying for them.

(16) On September 21, 1978, Hay advised Logan that if it would forward the sum of $3,775.55 to Seaboard, Record could pick up the iron castings and begin production of the gates. Logan agreed to do this and on September 25, 1978 sent the requested amount to Seaboard.

(17) The gates were finally machined and finished in December of 1978, and on December 15, 1978, Logan picked up three of the smaller gates and on December 29, 1978 picked up the remaining two gates.

(18) Because of the delay in delivery Logan had to call personnel back to work in December of 1978 and January of 1979 to install the gates after the project had been completed (except for the gates). If the gates had been delivered in June of 1978

Logan could have installed them without additional labor.

(19) Logan also had to move additional machinery and equipment such as bulldozers and backhoes to the job site for the installation of the gates.

(20) Logan incurred $1,500 in transportation expenses in picking up the sluice gates on December 15, 1978 and on December 29, 1978 against which Record gave a $401.17 credit because of reduced shipping costs.

(21) Logan incurred a loss of interest on the $3,775.55 advanced to Seaboard on Record's behalf in the amount of $79.44.

(22) Logan incurred labor expenses in December, 1978, and January, 1979 in installing the sluice gates as follows:

| | |
|---|---|
| 462.5 labor hours at $8.64 | $ 3,996.00 |
| 113.5 labor hours at $11.27 | 1,279.15 |
| 279.0 operator hours at $11.935 | 3,329.87 |
| 151.0 supervisory hours at $18.00 | 2,718.00 |
| Total | $11,323.02 |
| Payroll taxes and insurance | 2,830.76 |
| Total | $14,153.78 |

(23) Logan incurred machinery and equipment expenses in December, 1978 and January, 1979 in installing the sluice gates as follows:

| | |
|---|---|
| Backhoe: 151 hours at $16.00 | $ 2,416.00 |
| Dozer: 64 hours at $26.00 | 1,664.00 |
| Front end loader: 64 hours at $26.00 | 1,664.00 |
| Water pump: 10 days at $13.50 | 135.00 |
| Pick up trucks (2): 21 days at $20.00 | 840.00 |
| Lowboy: 32 hours at $25.00 | 800.00 |
| Generator: 21 days at $25.00 | 525.00 |
| Electric tools: 21 days at $10.00 | 210.00 |
| Total | $ 8,254.00 |

(24) Logan incurred miscellaneous expenses in December, 1978 and January, 1979 in installing the sluice gates as follows:

| | | |
|---|---:|---:|
| Gas Heaters (2)— | $ | 50.00 |
| 100 pound bottles of gas (4)— | | 100.00 |
| Straw (50 bales)— | | 50.00 |
| Visqueen (1 roll)— | | 7.40 |
| Total | $ | 207.70 |

## DISCUSSION AND CONCLUSIONS OF LAW

(A) Plaintiff's Claim

The parties have stipulated that the unpaid balance due Record on its claim for the sluice gates is $11,286.28. This figure apparently takes into account the $3,775.55 advanced to Seaboard by Logan as well as a credit of $401.17 with regard to reduced shipping costs because of Logan's having picked up the sluice gates in question. Accordingly, the court will find in favor of plaintiff on plaintiff's claim in the amount of $11,286.28.

(B) Defendant's Counterclaim

Logan's counterclaim for damages is predicted upon Record's delay in delivery of the ordered sluice gates. In accordance with the parties' contract, the drawings for the sluice gates were approved which was communicated to Record on February 4, 1978 and therefore, the gates would have been due in Logan's possession sometime in late May or early June of 1978. The damages that Logan claims are consequential or incidental damages arising out of the delay.

Initially, Record contends that it is not liable for the delay because of its interruption in supply of extruded bronze which was essential to the manufacture of the sluice gates. This defense known as the doctrine of "commercial impracticability"

arises from 13 Pa.C.S.A. §2615 which provides as follows:

(1) "Delay in delivery . . . by a seller who complies with paragraphs (2) and (3) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contigency the non-occurrence of which was a basic assumption on which the contract was made . . .

(2) (inapplicable)

(3) The seller must notify the buyer seasonably that there will be a delay . . .

As Record has pointed out, there is little appellate authority discussing the above quoted statute as it pertains to this case. For example, is a strike of a major supplier of a seller an event which makes performance under a contract impracticable within the meaning of the statute? Plaintiff relies somewhat on Comment 4 to the aforesaid statute indicating that a severe shortage of raw materials or supplies due to a contingency such as an unforeseen shutdown of major sources of supply or the like so qualifies. However, there seems to be a suggestion in Comment 1 that there is a test of foreseeability involved in such a circumstance. In this regard, Comment 1 provides that the section applies where performance has become commercially impracticable because of unforeseen supervening circumstances not within the contemplation of the parties at the time of contracting.

The question then arises as to whether a strike by a domestic supplier is such an unforeseen supervening circumstance. While not decided under §2615, Luria Engineering Company v. Aetna Casualty Surety Company, 206 Pa. Superior Ct., 333, 213 A. 2d 151 (1965) has held that a labor

dispute is not such an unforeseen contingency that it could not have been provided for in a contract so as to excuse a delay in performance under the contract. While Record has asserted an uninterrupted supply of extruded bronze from Anaconda since 1968, this by itself would not render a strike by Anaconda employees as unforeseeable. As pointed out in Luria, supra, we live in a union-conscious society. The use of a strike as a collective bargaining tool is not a rarity, and it would have been a simple matter to have provided for such a contingency in the contract as an excuse for a delay in performance.

Even if it were concluded that the Anaconda strike created commercial impracticability in performance so as to excuse Record from its delivery date commitment, the court would be unable to apply §2615 because it is not satisfied that Record seasonably notified Logan that there would be a delay. Along these lines it should be noted that the strongest evidence of such a notification revolves around the April 28, 1978 form letter to Record's customers advising them of the possibility of a delay. Initially, it should be noted that §2615(3) speaks in terms of the seller notifiying a buyer that there definitely will be a delay as opposed to the possibility of a delay. A strict interpretation of this statutory provision would require a finding that Record did not notify any customer including Logan of a specific and definite delay in delivery.

However, in view of the lack of credible evidence that Logan received the April 28, 1978 form letter or any other specific advice that there would be a delay, the court must conclude that there was not a seasonable notification to Logan by Record. Even the April 28, 1978 form letter is not very seasonable when one considers the fact that the strike in question began in October of 1977. It is germane to

wonder why an advice of possible delay took so long in the first place independent of any question as to its having actually been communicated to Logan. Thus, the court concludes that the defense of commercial impracticability under §2615 is not available to Record.

Defendant has also argued that delivery was not due during the last week of May or the first week of June of 1978 as contended by Logan. In this regard Record relies upon the mid-July 1978 modification in the plans. There is some dispute as to whether this modification applied to a shear gate which was independent of the sluice gates or whether it applied to stainless steel stems for these gates. The court concludes in this respect that the drawing was substantially approved and that the changes which Record relies upon were de minimis in nature and occured beyond the 16 to 18 weeks within which the gates were due under the February 4, 1978 approval. If the court were facing an issue as to whether the gates in fact complied with the drawings then the subsequent drawing approvals might be of some significance.

Under 13 Pa.C.S.A. §2715(a)(3), Record is liable to Logan for incidental and consequential damages that constitute " . . . any . . . reasonable expense incident to the delay . . . " As argued by Record, such damages must be proven with reasonable certainty. Exton Drive-In, Inc. v. Home Indemnity Co., 261 A. 2d 319, 436 Pa. 480, 488 (1969). However, this standard does not require absolute exactitude or certainty in establishing the amount of damages, and as further pointed out in Exton, supra, "compensation for breach of contract cannot be justly refused because proof of the exact amount of loss is not produced."

In the present case, Logan's incidental and consequential damages should be confined to those

additional expenses to which it was put because of not receiving the sluice gates by June of 1978. The circumstances make it somewhat difficult to ascertain that additional expense since Logan's total cost of installing the gates in December of 1978 and January of 1979 must be reduced by what it would normally have cost to do the same installation in June of 1978. Because of seasonal differences in the weather and the need to retransport machinery and equipment to the job site, the additional installation costs cannot be establilshed to the exact dollar. By necessity this computation requires some degree of estimation and judgment which is consistent with the reasonable certainty standard of proof.

It is also true as contended by Record that Logan's increased costs or damages must be such thay they could not have with reasonable effort been avoided. Emporium Area Joint School Authority v. Anundson Construction and Building Supply Co., 156 A. 2d 554, 191 Pa. Superior Ct. 372, 389 (1959). However, in applying this standard to the present case, the court perceives no expenses falling within the area of reasonable avoidance.

Logan's initial claim is for transportation expenses arising from its having to send a truck and driver to Maine on two separate occasions to pick up the gates. The sum of $1,500 is claimed based upon expenses for vehicle usage and driver's salary, the total of which has been submitted at the rate of $25 per hour and would therefore entail 60 hours. The rate per hour appears to be reasonable and the total hours for two round trips from Pennsylvania to Maine is acceptable. Certainly the expense was not reasonably avoidable given the circumstance that Logan was in default with the time provisions of its contract because of Record's delay. Its interest in picking up the gates as soon as they were ready was

a prudent move in view of its vulnerability for damages for delay in its performance. Accordingly, the sum of $1,500 will be allowed as damages less the $401.17 transportation credit allowed by Record leaving net damages for transportation and delivery expenses of $1,098.83.

The next area of claimed damages relates to the interest expense on Logan's $3,775.55 advancement to Seaboard. The parties have computed this sum in different ways, and the court accepts Record's computation based upon Logan's payment being due 30 days after delivery. Accordingly, Logan's interest claim would embrace 128 days at the rate of six percent with the total interest allowable to be $79.44.

The third area of damages involves Logan's labor and employee costs in installing the gates. Initially, the court will disallow the claimed profit and overhead expense since this would not be an out of pocket expense. Second, the claim for supervisory hours and payroll taxes and insurance attributable thereto will be disallowed since Logan's evidence indicated that supervisory personnel were not recalled for the installation, but were on salary and would have been getting paid regardless. This leaves a net total labor and payroll taxes and insurance expense of $10,756.40. Logan's estimate is that 80 percent of this figure represents additional expense over that which would have been incurred in June of 1978 if the gates had been available for installation then. There is no evidence contradicting this estimate; however, it must be noted that it is not supported by any factual data. The court is satisfied that Logan incurred additional labor expenses as a result of Record's delay but questions whether that additional cost is as high as 80 percent of the total cost. After considering the circumstances of adverse weather conditions and restart

and retransportation expense, the court concludes that 50 percent of the total labor costs represents a closer approximation of Logan's additional costs. Thus, the sum of $5,378.20 will be allowed as damages in this area.

The fourth claim for damages arises from additional machinery and equipment expense associated with the installation of the gates. The total hours and days of usage as well as the hourly or daily charge are deemed reasonable in computing Logan's total cost of $8,254. However, the estimate that 80 percent of this figure represents additional expense is rejected in favor of the 50 percent formula. Damages in the amount of $4,127 will accordingly be awarded.

The final area of claimed damages is in the area of miscellaneous job site expenses. These total $207.70 and all arose because of the winter conditions which complicated the process of pouring concrete. They will be allowed as damages in the amount claimed.

## DECISION

And now, June 3, 1982, based on the foregoing opinion, the court finds as follows:

(1) With regard to plaintiff's claim for plaintiff in the amount of $11,286.28; and

(2) With regard to defendant's counterclaim for defendant in the amount of $10,891.17.